UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **RICO TAYLOR** | : | **CIVIL ACTION NO. 2:18-cv-0113** |
| **REG. # 90834-071** | | |
| **VERSUS** | : | **UNASSIGNED DISTRICT JUDGE** |
| **UNITED STATES OF AMERICA** | : | **MAGISTRATE JUDGE KAY** |

**REPORT AND RECOMMENDATION**

Before the court is a Motion for Summary Judgment [doc. 44] filed by defendant the United States of America ("government"), in response to the claims raised by pro se plaintiff Rico Taylor under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* The motion is opposed and has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636.

**I.**
**BACKGROUND**

Taylor complains of medical care he received while he was an inmate in the custody of the Bureau Prisons ("BOP") housed at the Federal Correctional Institution at Oakdale, Louisiana ("FCIO"). These allegations relate to treatment of nodules in his groin area from October 2013 until December 2014, when he was transferred to another facility. Doc. 6. A more detailed summary of Taylor's allegations can be found at this court's amend order from March 2018. *See* doc. 8, pp. 1–3. Namely, Taylor complains about aspects of the treatment he received (specifically,

delays in surgical intervention, oncology consult, and radiation therapy) for a condition eventually diagnosed as dermatofibrosarcoma. Doc. 6.

Taylor brought suit in this court against the United States under the Federal Tort Claims Act and against various individual defendants under *Bivens v. Six Unknown Named Agents*, 91 S.Ct. 1999 (1971). The court ruled that Taylor's *Bivens* claims were prescribed and ordered dismissal of same. Docs. 12, 14. The government now moves for summary judgment on the FTCA claims, asserting that Taylor cannot prevail on his medical malpractice/negligence allegations in light of his failure to provide an expert opinion. Doc. 44; doc. 44, att. 2. Taylor opposes the motion, arguing that the negligence in his case is obvious enough to survive without supporting expert testimony. Doc. 46, att. 1.

## II.
### LAW & APPLICATION

### A. *Summary Judgment Standard*

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*,

896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 106 S.Ct. at 2511 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2110 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Finally, "[a] motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule," and the movant still has the burden of establishing the absence of a genuine issue of material fact. *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 (5th Cir. 1995). The nonmovant's failure to file an opposition and statement of contested material facts, however, requires the court to deem the movant's statement of uncontested material facts admitted for the purposes of this motion. Local Rule 56.2.

Louisiana Revised Statute § 9:2794 sets out the elements of a medical malpractice claim under Louisiana law. A plaintiff must prove: (1) the applicable standard of care; (2) a breach of that standard of care by the defendant; and (3) that the plaintiff's injury was a proximate result of that breach. *Id.* at § 9:2794(A). Nurses who perform medical services are subject to the same standard of care as physicians: to exercise the degree of skill ordinarily employed under similar circumstances by members of the profession in good standing in the same community or locality, and to use reasonable care and diligence, along with their best judgment, in their application of skill to the case. *Little v. Pou*, 975 So.2d 666, 674–75 (La. Ct. App. 2d Cir. 2008). Injury alone does not create a presumption of negligence, and the plaintiff has not proven his case if the harm

would have resulted nevertheless. La. Rev. Stat. § 9:2794(A)(3), (C); *Swartzlander v. Hunt Lab. Inc.*, 552 So.2d 1339 (La. Ct. App. 5th Cir. 1989). Expert support is usually required to establish the applicable standard of care. *Schultz v. Guoth*, 57 So.3d 1002, 1006–07 (La. 2011). However, an exception is made where "the negligence is so obvious that a lay person can infer [it] without the guidance of expert testimony." *Id.* This standard encompasses cases involving an "obviously careless act," such as amputating the wrong limb or dropping an instrument in a patient during surgery, as well as failure to attend a patient "when the circumstances demonstrate the serious consequences of this failure." *Pfiffner v. Corea*, 643 So.2d 1228, 1233–34 (La. 1994).

### B. Application

In support of its motion, the government provides Taylor's medical records and the following chronology of his care at FCIO: Taylor first reported three raised areas on his groin at a sick call on October 21, 2013. Doc. 44, att. 4, pp. 1–2. At that time he agreed with his provider's plan to observe the lesions for change. *Id.* He made another sick call on January 13, 2014, and it was discovered that the maximum width of the lesions had increased from .5 centimeters to 1.5 centimeters. *Id.* at 1–2, 212–13. The provider, a physician assistant, entered a request for surgical consult. *Id.* at 212–13. The consult was approved on January 15, 2014, to be scheduled with an outside contractor. *Id.* at 368. He returned to sick call in March 2014, complaining that the lesions were causing discomfort and getting bigger. *Id.* at 210–11. He was told to watch for the general surgery appointment and to keep the area clean and dry. *Id.* He was approved to see a specialist on April 21, 2014.[1] *Id.* at 361. He made another sick call on June 6, again complaining that the lesions were increasing in size and causing discomfort. *Id.* at 188. He received his general surgery consult on June 9, and it was recommended that the lesions be removed "ASAP" due to the risk of cancer.

---

[1] Taylor also made other sick calls through March and April 2014 for complaints of foot numbness and pain, as well as back pain from a previous gunshot wound. *Id.* at 195–205.

*Id.* at 355. He was approved for surgery on July 1, and seen at sick call several times through the summer with complaints that the lesion was irritating him and getting larger. *Id.* at 351, 181–86. Taylor was prescribed pain medication and antibiotics as a result of these visits. *Id.*

On August 15, 2014, Taylor saw a general surgeon. *Id.* at 174–76, 337–38. This provider also recommended immediate excision and prescribed Tylenol 3. *Id.* Taylor was again approved for general surgery on August 20, and the surgery was performed on August 26. *Id.* at 162–66, 344–48. As a result, he was diagnosed with a sarcoma and referred for a surgery consult for a wider excision. *Id.* He underwent this procedure on September 4. *Id.* at 125, 318–24, 339–43. He received a consult from an outside oncologist on September 30. *Id.* at 98. The oncologist, who had reviewed a pathology report from the operation, advised that no immediate follow-up was needed and recommended following up in six months. *Id.*

Taylor made another sick call on October 6, complaining of pain at the excision site. *Id.* at 95–97. He received a prescription for one week of Tylenol 3 (acetaminophen/codeine 300 mg). *Id.* at 93–97. He returned on October 21 and 27, 2014, still complaining of pain, and was prescribed a 90-day course of acetaminophen. *Id.* at 88–91. He saw a nurse practitioner for urinary problems on October 28 and discussed the pathology report from his excision at this visit. *Id.* at 84–86. On November 5, he saw another oncologist. *Id.* at 71. This provider recommended that Taylor be seen by radiation oncology as soon as possible. *Id.* Taylor made multiple sick calls for groin pain, among other complaints, through the rest of the month. *Id.* at 54–56, 62–69. He received another oncology consult on November 18. *Id.* at 296–99. That provider stated that he would need to review the case with the pathologist in order to determine if the risk of recurrence was high enough to justify radiation, which carried other risks that the provider discussed with Taylor. *Id.* at 298. A

radiology ultrasound request was approved on November 26 and a consult was submitted for radiotherapy on December 10. *Id.* at 61, 295.

On December 23, 2014, Taylor was transferred to the Federal Correctional Center in Butner, North Carolina ("FCC-Butner"). *Id.* at 46–53. At that site he received regular care with consults from a number of specialists (including sarcoma specialists at Duke University Medical Center), pain medications, and referrals to pain management programs and physical therapy, though it was determined by the specialists there that radiation was not indicated. *See* summary provided at doc. 44, att. 3, pp. 6–13. The last records submitted by the government from FCC Butner, dated August 5, 2016, provide that there is no recurrence of the sarcoma and that Taylor is in remission. Doc. 44, att. 4, pp. 894–900. Taylor's last records, dated January 2017, confirm this result but note that he continues to experience pain, likely as a result of scar tissue in his left groin. Doc. 46, att. 3, p. 13.

The record shows a delay of just under five months from the time an FCIO provider first recommended surgical evaluation and roughly two and a half months from that consult until the first operation in August 2014. It also shows brief delays in November and December 2014 between evaluation of his need for radiation and his transfer to FCC-Butner, where he received immediate and intensive care with multiple specialists. Taylor's pain complaints were addressed through multiple prescriptions and consultations during his time at FCIO. Although his recovery, as shown through his records from FCC-Butner, appeared complicated, there is no way for the court to determine whether these complications resulted from any delay in treatment at FCIO.

Taylor has not sought to designate an expert and instead argues that the negligence in his case is obvious enough to support a breach of the providers' standards of care. Doc. 46, att. 1. The record here, however, does not provide a basis for inferring medical malpractice without expert

guidance. Accordingly, the government has carried its burden on the motion and Taylor's claims must be dismissed.

### III.
#### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that the Motion for Summary Judgment [doc. 44] be **GRANTED** and that all claims be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 23rd day of April, 2019.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE